UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Choice Hotels International, Inc. | ) | Civil Action No.: 4:13-cv-1961 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | **Opinion and Order** |
| Zeal, LLC, Harshil J. Shah, Pranay | ) | |
| Parekh, Chhaya Parekh, Rajan | ) | |
| Gupta, and Monica Garg, | ) | |
| | ) | |
| _____ Defendants. | ) | |

This matter is before the Court on the motion of the plaintiff, Choice Hotels International, Inc., for summary judgment (ECF No. 58). The Court held a hearing on the motion on August 18, 2015, and has considered the parties' briefing in support and opposition. For the reasons set forth herein the Court grants the motion for summary judgment.

## BACKGROUND

The plaintiff is the owner of a "family" of ECONO LODGE® trademarks which it uses in connection with its lodging franchise business. The defendants are the owners of a hotel in Myrtle Beach (the "Subject Property") that was previously owned by Kelley Properties, LLC ("Kelley"), a former franchisee of the plaintiff. Kelley operated an ECONO LODGE INN & SUITES, but its rights to do so were terminated before the hotel was acquired by the defendants. Nevertheless, the defendants continued to operate the hotel as an ECONO LODGE INN & SUITES, displaying the plaintiff's trademark on a large sign in front of the Subject Property. When the defendants finally rebranded the hotel, they changed the name to ECONO STUDIOS INN & SUITES, and replaced the

plaintiff's sign with a new sign bearing the new name.[1]  The plaintiff alleges that this modified name still violates its trademark and creates a likelihood of consumer confusion.

The plaintiff advanced causes of action for trademark infringement and unfair competition under the Lanham Act and common law.  The plaintiff seeks a permanent injunction prohibiting the defendant from further use of any of the marks in the ECONO LODGE family of marks and from further use of the similar ECONO STUDIOS INN & SUITES.  The plaintiff also seeks the profits of the infringer, damages suffered by the plaintiff, and the costs of the action.

## STANDARD OF REVIEW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

---

[1] In their response to the plaintiff's motion for summary judgment, the defendants allege that "[t]he name went from 'Econo Lodge' which was spelled as two words to the name 'Econostudios' spelled as one word.  However, the picture of the large sign outside the Subject Property, shown on pages 11-12 of the plaintiff's complaint, shows the defendants' mark written as two words, "Econo Studios."  The defendants have not contested the accuracy of the picture in the complaint, and in the absence of evidence from the defendants showing that they are using the mark as a single word, the Court will treat it as two words.

materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "Likelihood of confusion," a key inquiry in many trademark cases, "is a factual issue dependent on the circumstances of each case." *Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp.*, 148

F.3d 417, 422 (4th Cir. 1998).  "Nevertheless, summary judgment is appropriate when the material, undisputed facts disclose a likelihood of confusion."  *Id.*

## DISCUSSION

### I.    Infringement

To establish trademark infringement under the Lanham Act, the plaintiff must prove: "(1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (internal citations omitted).

### A.  The Plaintiff Owns a Valid Mark

The plaintiff contends that it owns a family of ECONO LODGE trademarks.  In support of this claim, it submitted copies of certificates of registration issued by the United States Patent and Trademark Office (USPTO), which are attached as Exhibits 1-8 to the plaintiff's complaint.  (*See* ECF No. 1.)  The plaintiff also alleges that the registrations have achieved incontestable status under Section 15 of the Lanham Act, 15 U.S.C. §1065.  The defendants do not dispute the plaintiff's ownership of the marks or their incontestable status.

### B.  The Defendants Used the Mark "In Commerce" Without Authorization

The plaintiff claims that the defendant used its marks in commerce without authorization in two different ways.  First, the plaintiff alleges that when the defendants purchased the Subject Property from the holdover franchisee, they began operating the

4

facility before removing the ECONO LODGE sign and other ECONO LODGE branded materials.  The defendants admit that they operated the facility using the plaintiff's marks for a short period of time while they negotiated with the plaintiff regarding whether Zeal, LLC would become a franchisee.  The defendants allege that once these negotiations fell through, they removed the ECONO LODGE sign and ECONO LODGE branded materials and changed the name of the facility.  Second, the plaintiff alleges that the "new" name and mark that the defendants adopted, ECONO STUDIOS INN & SUITES, infringes the plaintiff's ECONO LODGE family of marks, which includes the mark, ECONO LODGE INN & SUITES.  The plaintiff alleges that the defendants began using the new mark without the plaintiff's permission, which defendants concede, arguing that they did not need the plaintiff's permission because the marks are sufficiently distinct.

### C.  The Defendants Used the Mark or an Imitation in Connection with the Sale, Offering for Sale, Distribution, or Advertising of Goods or Services.

It is undisputed that the defendants used both the plaintiff's mark and the "new" mark in connection with the sale, offering for sale, distribution, or advertising of goods and services, specifically, lodging accommodations at the Subject Property.

### D.  Likelihood of Confusion

It is axiomatic that continued unauthorized use of a mark by a holdover franchisee creates a likelihood of confusion in the marketplace.  Several circuits have held that where a franchisee continues to use the franchisor's mark without authorization, likelihood of confusion can be assumed and the traditional analysis is unnecessary.  *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190

(6th Cir. 1997) ("[P]roof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'"); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks . . . . [and] many courts have held that continued trademark use by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement.").

As the plaintiff points out, the defendants are not even holdover franchisees, but merely successors in interest to holdover franchisees, meaning that the defendants never actually had permission to use the plaintiff's mark at any point.  Here the defendants do not meaningfully contest that their operation of the Subject Property while it was still branded an ECONO LODGE created a likelihood of confusion.  The defendants' brief in opposition to the motion for summary judgment fails to address the defendants' operation of the Subject Property prior to removing the ECONO LODGE sign and other branded materials.  At the hearing on the motion for summary judgment, defense counsel argued that the use was *de minimis* and that the plaintiff had implicitly consented to the defendants continuing to operate the hotel while the parties negotiated whether the defendants would become a franchisee.  This argument was not supported with any legal authority indicating that such circumstances excuse trademark infringement or with any facts from the record showing that the plaintiff acquiesced in the continued use of its mark.  Accordingly, the Court finds that the defendants' operation of the Subject Property prior to deflagging it and removing materials bearing

the plaintiff's mark or marks created a likelihood of consumer confusion regarding the defendants' association with the plaintiff's brand.

The more difficult and consequential issue is whether the defendants infringed the plaintiff's marks by using its "new mark," ECONO STUDIOS INN & SUITES.  The "ultimate question" in determining whether a new mark infringes an existing mark is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods or services in question.  *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990) (quotation marks and citations omitted).  In conducting this inquiry, courts apply a flexible test that considers the following nine factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in
> the marketplace;
> (2) the similarity of the two marks to consumers;
> (3) the similarity of the goods or services that the marks identify;
> (4) the similarity of the facilities used by the markholders;
> (5) the similarity of advertising used by the markholders;
> (6) the defendant's intent;
> (7) actual confusion;
> (8) the quality of the defendant's product; and
> (9) the sophistication of the consuming public.

*George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009).  "This judicially created list of factors is not intended to be exhaustive or mandatory," *Rosetta Stone Ltd.*, 676 F.3d at 154, and not all these factors are always relevant or equally emphasized in each case," *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (quotation marks and citation omitted).  In "determin[ing] whether the defendant's use is likely to cause confusion," a court must consider how "the two parties actually use their marks in the marketplace."  *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006).

Before analyzing the individual factors, the Court notes that it is not the first to consider whether a similar mark used by a competing hotel infringes the plaintiff's ECONO LODGE marks.  Although neither party directed the Court to this case, a 2000 decision from the Middle District of Alabama considered whether a motel operating across the street from an ECONO LODGE infringed the plaintiff's trademarks when it adopted the name, "ECONOTEL."  *See Choice Hotels Intern., Inc. v. Kaushik*, 147 F. Supp. 2d 1242 (M.D. Ala. 2000) *aff'd sub nom. Choice Hotels Intern. v. Kaushik*, 260 F.3d 627 (11th Cir. 2001).  The *Kaushik* Court held a bench trial, and while it found that "the issues" were "very close," it ultimately ruled against Choice Hotels and found no infringement.  *Id.* at 1244.  The case at hand is distinguishable in numerous respects, but the Court finds *Kaushik* to be instructive on select issues.  Additionally, the Patent Office Trademark Trial and Appeal Board (TTAB) found in favor of the plaintiff's predecessor in a trademark registration matter where the Econo-Travel Motor Hotel Corporation, which at the time held the trademarks "ECONO-TRAVEL" and "ECONO LODGE," opposed the registration of "ECON-O-TEL."  *Econo-Travel Motor Hotel Corp.*, 199 U.S.P.Q. (BNA) ¶ 307 (Trademark Tr. & App. Bd. Mar. 28, 1978).  Turning to the nine-factored test for likelihood of confusion, the Court finds that the plaintiff is entitled to summary judgment.

### (1) <u>*The Strength Or Distinctiveness Of The Plaintiff's Mark As Actually Used In The Marketplace*</u>

The first factor the Court considers is the strength of the plaintiff's mark, which is relevant because "encroachment upon a strong mark is more likely to cause confusion." *Rosetta Stone Ltd.*, 676 F.3d at 154.  The "strength" of a trademark is evaluated in terms of both "conceptual strength and commercial strength."  *CareFirst of Maryland,*

*Inc.*, 434 F.3d at 269. "Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical 'peculiarity' of the mark considered in relation to the product, service, or collective organization to which the mark attaches." *Id.* The first step is to place the mark into "one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *George & Co. LLC*, 575 F.3d at 394. A generic mark "describes a product in its entirety" and "is never entitled to trademark protection." *Id.* "Light beer" is a common example of a generic term that could not be trademarked. *See Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 80 (7th Cir. 1977).

"Descriptive" marks "merely describe a function, use, characteristic, size, or intended purpose of the product," *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996), and define the characteristic "in a way that does not require any exercise of the imagination," *George & Co. LLC*, 575 F.3d at 394. Examples of descriptive marks "include After Tan post-tanning lotion, 5 Minute glue, King Size men's clothing, and the Yellow Pages telephone directory." *Sara Lee Corp*, 81 F.3d at 464. Such marks are entitled to trademark protection if they have acquired secondary meaning, i.e., they have "become sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product." *George & Co. LLC*, 575 F.3d at 394 (quotation marks and citation omitted).

"Suggestive marks, which are . . . inherently distinctive, do not describe a product's features but merely suggest them." *Id.* "In other words, the exercise of some imagination is required to associate a suggestive mark with the product." *Id.* Finally, "fanciful" marks "typically involve made-up words created for the sole purpose of serving

as a trademark," and "arbitrary" marks "typically involve common words that have no connection with the actual product."  *Id.*  These marks are "inherently distinctive" and entitled to the highest level of protection.  *Id.*

The second step considers the mark's commercial strength, "a concept similar to the 'secondary meaning' inquiry considered in evaluating a mark's validity." *Id.* at 395. As the Fourth Circuit explained in *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88 (4th Cir. 1997):

> The strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.  Thus, courts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers.

*Id.* at 93.  This inquiry "looks at the marketplace and asks 'if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise.'" *CareFirst of Maryland, Inc.*, 434 F.3d at 269 (quoting *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 160–61 (4th Cir. 1962)).  Courts also consider "the frequency of prior use of the word in other marks, particularly in the same field of merchandise or service."  *Pizzeria Uno Corp.*, 747 F.2d at 1530-31.

The plaintiff's marks are clearly neither generic nor fanciful, so the issue is whether they should be classified as suggestive or descriptive.  The defendants argue that the marks, or at least the "ECONO" portion of the marks, is merely descriptive. (ECF No. 64 at 3-4.)  Pursuant to the well-established "anti-dissection rule," the Court declines to break the marks into separate components for comparison.  *See* 4 McCarthy on Trademarks and Unfair Competition § 23:41 (4th ed.) ("Conflicting composite marks

are to be compared by looking at them as a whole, rather than breaking the marks up into their component parts for comparison."). Still, the defendants are correct, that "ECONO" is the "dominant feature" of the marks at issue, and it is consequently the primary focus of the Court's comparison. *See* 4 McCarthy on Trademarks and Unfair Competition § 23:44 (4th ed.) ("Although it is not proper to dissect a mark, one feature of a mark may be more significant and it is proper to give greater force and effect to that dominant feature."); *Pizzeria Uno Corp.*, 747 F.2d at1529-30 ("Where the proposed mark consists of but two words, one of which is disclaimed, the word not disclaimed is generally regarded as the dominant or critical term in determining the distinctiveness or suggestiveness of the proposed mark.").

The defendants' analysis is brief and conclusory, but there is some support for their argument that the plaintiff's marks are descriptive in terms of their conceptual strength. The term "ECONO" appears to be an abbreviation for the word "economy," and the Fourth Circuit has held that an abbreviated descriptive term will still be held to be descriptive if it conveys to the buyer the original connotation. *See George & Co. LLC*, 575 F.3d at 394-95 (quoting 2 Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* § 11:32). The district court in the *Kaushik* case found that the mark ECONO LODGE, was descriptive, observing that "'Econo' is a shortened form of 'economy' which, in this context, refers to 'frugality in expenditures sometimes verging on parsimony'" and that "'Lodge' is a ubiquitous term for a short-term accommodation." *Kaushik*, 147 F. Supp. 2d at 1249 (quoting Webster's Third New International Dictionary 720 (1976)).

While the plaintiff's marks could be characterized descriptive from a purely conceptual standpoint, several factors weigh in favor of treating them as suggestive and finding that they are entitled to trademark protection.  First, the plaintiff's marks are not only registered, but have achieved incontestable status, and this fact weighs in favor of finding that the marks are sufficiently distinctive to warrant protection.  *See Pizzeria Uno Corp.*, 747 F.2d at 1534. (noting that the "Trademark Office granted plaintiff's mark registration without requiring proof of secondary meaning," and finding that "[s]uch action on the Office's part was a determination that plaintiff's mark was suggestive and not descriptive" and "should be considered prima facie correct by a court in considering the validity of a trademark").[2]  While the PTO's determination is not conclusive, it shifts the burden to the defendant to establish that the marks are not sufficiently distinctive. *See id.*; *Petro Stopping Centers, L.P.*, 130 F.3d at 93.  This shift is sensible because the defendants are effectively asking the Court to invalidate registered trademarks that have achieved incontestable status.  *See Pizzeria Uno Corp.*, 747 F.2d at 1534 ("By finding the plaintiff's trademark descriptive and that plaintiff had proved no secondary meaning for its mark, the district court had in effect held the plaintiff's trademark invalid as descriptive.").[3]

---

[2] *Pizzeria Uno Corporation* is somewhat distinguishable in that the plaintiff there submitted evidence that the PTO had granted registration "*without requiring proof of secondary meaning.*" The plaintiff has submitted copies of its registrations, but the Court cannot tell from the record whether the PTO required proof of secondary meaning.  Either way, the Court finds that the fact that the PTO granted the registrations supports the plaintiff's claim that the marks are entitled to protection.

[3] The Court expects that the defendants would respond that they are not trying to invalidate the plaintiff's trademarks, but simply to establish that the word "ECONO" is merely descriptive, so they are entitled to use it provided they do not literally copy the plaintiff's marks.  As discussed above, however, the term "ECONO" is clearly the dominant element of the plaintiff's marks. Indeed, the remaining words in the marks are disclaimed.  (*See* ECF No. 1, attachments 1-8.) To hold that the term "ECONO" is merely descriptive in this context is to practically invalidate the plaintiff's trademarks.

Second, the Court finds that the plaintiff's marks are commercially strong because of their long use by the plaintiff and or its predecessors, and even if the marks are descriptive from a conceptual standpoint, they have almost certainly acquired secondary meaning because consumers associate them with the plaintiff's brand. Additionally, the defendants' argument regarding secondary meaning seems to misunderstand the concept, as illustrated in the following excerpt from their brief:

> . . . marks that are "merely descriptive are accorded protection only if they have acquired a 'secondary meaning,'" such that, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Id. [Sara Lee Corp., 81 F.3d at 464] (quoting Dayton Progress Corp. v. Lane Punch Corp., 917 F.2d 836, 839-40 (4th Cir. 1990). An example of a such secondary meaning would include the word "Thermos" that although originally a brand name for a particular type of thermal mug has become commonly used for all thermal mugs regardless of manufacturer. The word "econo" has too become such a commonly used word with countless other businesses using the same prefix . . . .

(ECF No. 64 at 3-4, 7).

The defendants appear to be confusing the concept of secondary meaning, where a descriptive term gains trademark significance because it comes to be associated with a particular brand, with the concept of "genericide," where the public's pervasive use of a fanciful or arbitrary mark causes the mark to lose trademark significance.[4] *See King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577, 581 (2d Cir. 1963) (describing how the term "thermos" lost its significance as a trademark and became synonymous with an entire class of products); *see also Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 821 (4th Cir. 2001) (explaining the concept of genericide).

---

[4] This has also been known as the "Asprin and Celophane doctrine" referencing two famous brands that came to represent an entire class of products.

A party seeking to establish that a registered mark has become generic bears the burden of proof and must show that "the mark's primary significance to members of the 'relevant public'" is to indicate "a class of product or service and not its source." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). The party alleging genericide must offer more than "the subjective view of a casual purchaser" and provide "evidence" such as "purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Id.* No such evidence has been provided by the defendants in this case. However, the fact that the defendants made the genericide argument indicates that they recognize that the plaintiff, through its promotion of the ECONO LODGE marks, has made the term "ECONO" well known to the public. *See King-Seeley Thermos Co.*, 321 F.2d at 581 (acknowledging that a finding of genericide is a "harsh" result because "it places a penalty on the manufacturer who has made skillful use of advertising and has popularized his product"). The Court finds that the plaintiff's marks are commercially strong and that the defendants have failed to present evidence sufficient to establish genericide.

Third, as explained above, courts evaluating the strength of a mark or marks will look to frequency with which the dominant or contested portion of the mark has been used in other marks, particularly other marks in the same field of business. *See Pizzeria Uno Corp.*, 747 F.2d at 1530-31. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *CareFirst of Maryland, Inc.*, 434 F.3d at 270[5] (quoting

---

[5] The defendants' reliance on *CareFirst* is misplaced because, in that case, the Fourth Circuit specifically emphasized that other businesses in the *same industry* were using similar terms. *See CareFirst of Maryland, Inc.*, 434 F.3d at 270 ("Here, the record undeniably reveals substantial third-party use of the words 'Care,' 'CareFirst,' 'First,' and 'First Care' in the health

*Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1533 (10th Cir. 1994)). The defendants insist that the term "ECONO" is "a commonly used word with countless other businesses using the same prefix, including "Econo Auto-Paint," "Econo Foods," and "Econo Grocery." (ECF No. 64 at 4, 5, 7.) The Court is not familiar with these marks or the businesses to which they allegedly correspond, and the defendants have not provided any evidence to the Court that these marks are registered or used in commerce. On the other hand, the plaintiff has submitted results from the PTO's publicly available Trademark Electronic Search System (TESS) showing that a search for the term "ECONO" in the trademark name and the term "hotel" in the description of goods and services yields nine registered trademarks – all of them owned by Choice Hotels. This factor supports the strength of the plaintiff's mark. *See Econo-Travel Motor Hotel Corp.*, 199 U.S.P.Q. (BNA) ¶ 307 ("[I]ndeed, the very absence of third-party federal registrations of marks containing the term 'ECONO' for motel or related services serves to highlight the uniqueness of opposer's registered marks in this field.").

Finally, the Court notes that both the *Kaushik* Court and the TTAB found that ECONO LODGE was a sufficiently strong mark to warrant trademark protection. In *Kaushik*, the court found that the mark had obtained secondary meaning:

> The "Econo Lodge" design has obtained secondary meaning that entitles it to trademark protection. The simple fact that there are well over 700 Econo Lodge franchises throughout the United States and Canada leads the court to conclude that the name is associated with Choice Hotels' brand. Choice Hotels consistently markets Econo Lodge using exterior signs with red letters on a white background; no other symbols or words

---

care industry. CareFirst's own Thomson & Thomson trademark search reports state that many health-care-related businesses across the country use these marks. In addition, First Care has submitted dozens of web page print-outs from health-care-related businesses named CareFirst or First Care, as well as an investigator's report confirming that many businesses with these names are currently active.").

> are used. Kaushik has presented no credible evidence that third-parties in the industry use the Econo Lodge name. Further, two of the three relevant "Econo Lodge" designs have attained incontestable status.

*Kaushik*, 147 F. Supp. 2d at 1249.  Although it noted that the term "ECONO" was an abbreviation for the word "economy," the TTAB rejected the argument that the mark ECONO-TRAVEL was weak, generic, or merely descriptive.  *See Econo-Travel Motor Hotel Corp.*, 199 U.S.P.Q. (BNA) ¶ 307.  As the TTAB explained:

> There can be no doubt but the term "ECONO" is suggestive of the word "economy", but it is not devoid of trademark significance. Nor has applicant succeeded in its effort to establish that said term has been either commonly used or registered as a component of marks for motels or related services. . . . 'ECONO-TRAVEL' is a strong mark entitled to more than the limited scope of protection which applicant would have us accord to it.

*Id.*

For all of these reasons, the Court finds that the plaintiff's marks are sufficiently strong to continue to warrant trademark protection.  Although the marks could be characterized as descriptive from a purely conceptual standpoint, the Court finds that they are commercially strong and that the defendants have failed to present evidence to establish genericide.  Furthermore, even a relatively weak mark is entitled to protection from sufficiently similar marks used to promote sufficiently similar products.  *See Pizzeria Uno Corp.*, 747 at 1527 (noting that even a descriptive mark may be enforced "against closely similar marks which are used on virtually identical products"); *Emra Corp. v. Superclips Ltd.*, 559 F. Supp. 705, 713-14 (E.D. Mich. 1983) (finding that while the mark SUPERCUTS was "a weak mark consisting of descriptive terms," it was, nevertheless, sufficiently distinct to warrant protection from infringement from the confusingly similar SUPER CLIPS because its owners had "likely established secondary

meaning in areas where their services and products are sold or promoted and advertised").

### (2) – (5) *The "Similarity" Factors*

The Fourth Circuit has referred to factors 2-5 as the "similarity" factors, *see Sara Lee Corp.*, 81 F.3d at 465, and the Court will address them together.  These factors consider: the similarity of the two marks to consumers; the similarity of the goods or services that the marks identify; the similarity of the facilities used by the markholders; and, the similarity of advertising used by the markholders.  *Id.*

Beginning with the similarity of the marks to consumers, the "overall test under this factor is whether there exists a 'similarity in appearance and sound which would result in confusion.'"  *Petro Stopping Centers, L.P.*, 130 F.3d at 94 (4th Cir. 1997) (quoting *Pizzeria Uno Corp.*, 747 F.2d at 1534).  ECONO STUDIOS INN AND SUITES sounds very similar to ECONO LODGE INN AND SUITES.  They are virtually the same length, begin and end with the same word, and share the same dominant term, "ECONO".  *See Cent. 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) (finding that the use of identical dominant terms as the first word of the respective marks contributed to a likelihood of confusion); *Sun Microsystems, Inc. v. Sunriver Corp.*, C-95-20155 RPA, 1995 WL 390696, at *4 (N.D. Cal. June 27, 1995) (same).  The term "studios" is generic and is easily confused with the term "suites," which both marks share as well.  As Professor McCarthy has observed, "[a]dding a generic name to another's mark, especially if it is a famous mark, will not usually avoid a likelihood of confusion."  4 McCarthy on Trademarks and Unfair Competition § 23:50 (4th ed.)  To state what is obvious, the defendants replaced one term denoting a residence with

17

another term denoting a residence in the middle of the mark.  It is hard to imagine many other ways that they could have changed the wording of the plaintiff's mark and still had it sound as similar.[6]  *See Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 935 (6th Cir. 1999) ("Indeed, it would be difficult for TrafFix to adopt a mark that is closer to WindMaster than is WindBuster. This factor favors [plaintiff].") *rev'd, on other grounds* 532 U.S. 23 (2001).

The defendants argue that, despite the similar wording, there is no likelihood of confusion because they use different colors (green and brown as opposed to red and yellow), have changed the font, and have refrained from using the plaintiff's distinctive "e".  Differences in the colors and fonts used are certainly relevant in assessing the overall similarity of two marks and the likelihood of confusion.  *See CareFirst of Maryland, Inc.*, 434 F.3d at 271 ("[A] comparison of the texts of the two marks alone is insufficient if the marks have different appearances in the marketplace."); 4 McCarthy on Trademarks and Unfair Competition § 23:52 (4th ed.) (Courts "consider not only the similarity of the accused word marks, but also the similarity of the lettering style, color and format and any accompanying background matter.").  However, in this case, the fact that the defendants used different colors and font is not sufficient to overcome the substantial likelihood of confusion that results from the incredible similarity in the wording of the marks.  *See Watts Health Sys., Inc. v. United Healthcare Corp.*, 960 F. Supp. 1431, 1435 (C.D. Cal. 1996) ("Although the words are capitalized in one mark and not all capitalized in another mark, and they use different colors, this Court finds that the public is not necessarily going to distinguish these two marks as representing two separate companies based upon such small nuances.").

---

[6] "ECONO *LOFTS* INN AND SUITES" would be worse, but only marginally so.

In researching this case, the Court has found several similar cases where a junior user has made minor changes to the non-dominant portion of the wording of the senior user's mark, and, although the junior user changed the appearance of the mark, the courts still found a likelihood of confusion. *See Russell v. Caesar*, C 01-2478 MJJ, 2001 WL 1835165, at *5 (N.D. Cal. Dec. 20, 2001) (winemaker's use of the mark "RABBIT HILL" created likelihood of confusion with competitor's "RABBIT RIDGE" despite significant differences in the appearance of the parties' labels); *Watts Health Sys., Inc.*, 960 F. Supp. at 1435 (HMO's use of mark "UNITEDHEALTHCARE" created likelihood of confusion with competitor's "UNITED HEALTH PLAN" despite differences in colors, fonts, and images used with the marks); *Diner, Inc. v. Dream Kitchen, Inc.*, 95 CIV. 4130 (LMM), 1995 WL 438627, at *4 (S.D.N.Y. July 24, 1995) (baker's use of the mark "HONEST BAKER" created a likelihood of confusion with restaurant's "HONEST DINER" without any discussion of similarities between graphics and colors); *Colgate-Palmolive Co.*, 184 U.S.P.Q. (BNA) ¶ 380 (Trademark Tr. & App. Bd. Sept. 3, 1974) (use of the mark "ULTRA DENT" for denture cleanser would create a likelihood of confusion with "ULTRA BRITE" mark for dentifrice).  The Court finds that the parties' marks are very similar in their sound, appearance, and meaning, despite the graphic differences emphasized by the defendants.

Similarity of the services offered is measured "with respect to each party's actual performance in the marketplace." *CareFirst of Maryland, Inc.,* 434 F.3d at 272.  The parties' offerings do not have to be identical for a court to find that they are similar.  *See Pizzeria Uno Corp.*, 747 F.2d at 1535 (finding that a business that  offered "Italian cuisine, and full bar, in a sit-down restaurant" and a business that offered "drive-through

and counter service for Mexican fast food" were sufficiently similar to weigh in favor of finding infringement).  The defendants claim that they offer "extended stay suites" while the plaintiff offers "traditional, single bedroom lodging."  (ECF No. 64.)  The defendants also claim that they provide "different amenities than those offered by Plaintiff," (*id.*), but provide no specifics in their brief and fail to direct the Court to any portion of the record illustrating the differences in the amenities they offer.  The Court finds that the goods and services offered are very similar if not identical.  The facilities used by the parties are as similar as they could possibly be because the defendants are operating a facility that used to be an ECONO LODGE.  Neither party addresses differences or similarities in their advertising, so the Court has not analyzed this factor or assigned it any weight. In short, all of the relevant similarity factors favor the plaintiff.

### (6) The Defendants' Intent

"The intent of a junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark."  *CareFirst of Maryland, Inc.*, 434 F.3d at 273.  The evidence regarding the defendants' intent is fairly limited.  The Court has reviewed the deposition of the defendants' 30(b)(6) designee, Harshil J. Shah, and, construed in the light most favorable to the defendants, the deposition suggests that the defendants acted in ignorance in adopting the name ECONO STUDIOS INN AND SUITES, sincerely believing that changing the word "Lodge" to "Studios" and removing the plaintiff's branding from the hotel was all that was required to avoid infringing the defendants' trademark.  On the other hand, the defendants were clearly aware that the Subject Property had formerly been operated as an ECONO LODGE INN AND SUITES, and it would be reasonable to assume that this fact played a

role in their decision to adopt the conveniently similar ECONO STUDIOS INN AND SUITES. Moreover, it is undisputed that the defendants did not conduct any trademark searches or consult an attorney to determine whether the name and signage they had adopted would infringe the plaintiff's marks.

These facts are not, however, sufficient for the Court to make a finding that the defendants intended to infringe the mark at this stage. *See George & Co. LLC*, 575 F.3d at 398 ("[T]he failure to conduct a trademark search or contact counsel shows carelessness at most, but is in any event irrelevant because knowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion." (quotation marks and citation omitted)). The defendants' intent is ultimately not necessary for this Court to conclude that the defendants' use of ECONO STUDIOS INN AND SUITES infringes the plaintiff's marks, so the Court need not consider the issue further at this point. *See Sara Lee Corp.*, 81 F.3d at 466 ("Because we would reach the same result in this case regardless of Kayser–Roth's intent, reviewing the district court's disposition of this complex issue would serve no purpose; we thus decline to do so."). To the extent that the defendants' intent is relevant for assessing damages, the Court will address it at a later proceeding.

### *(7) Actual Confusion*

"[E]vidence of actual confusion is often paramount in the likelihood of confusion analysis." *George & Co. LLC*, 575 F.3d at 393. As the Fourth Circuit has explained:

> If the strength of the senior mark is the alpha of infringement analysis, then evidence of actual confusion is surely the omega; where the defendant in an infringement case has elected to use a mark similar to that of a competitor's distinctive mark, and, as a result, has actually confused the public, our inquiry ends almost as soon as it begins.

21

*Sara Lee Corp.*, 81 F.3d at 467.  On the other hand, [a]lthough proof of actual confusion is not necessary to show a likelihood of confusion, the absence of any evidence of actual confusion over a substantial period of time . . . creates a strong inference that there is no likelihood of confusion."  *CareFirst of Maryland, Inc.*, 434 F.3d at 269.

The plaintiff has submitted meaningful evidence of consumer confusion.  First, the plaintiff was named as a party in a lawsuit brought by one of the defendants' patrons who alleged that he was injured on the Subject Property.  (*See Wilson v. Tani Hospitality, LLC, et al.*, 2014-CP-26, Horry County Court of Common Pleas, ECF No. 58-4.)  The alleged injury occurred almost nine months after the plaintiff terminated the franchise at the Subject Property and almost three months after the defendants changed their name to ECONO STUDIOS INN AND SUITES.  (*Id.*)  The injured patron alleges that when he advised the defendants' manager that he had been injured and repeatedly asked to contact the hotel owners, he was told by the manager that he should just hire a lawyer.  (*Id.* ¶¶ 21-22.)  Additionally, the plaintiff received a consumer complaint regarding the Subject Property almost a year and a half after the plaintiff terminated the franchise at the Subject Property and almost a year after the defendants adopted the name ECONO STUDIOS INN AND SUITES.  (*See* ECF No. 58-5.)  The record indicates that a guest staying at the Subject Property called Choice Hotels to complain about a lack of hot water and drug activity at the defendants' hotel.  (*Id.*)

According to the defendants, the fact that there are only "two weak instances of alleged confusion actually creates a presumption *against* likelihood of confusion in the future."  (ECF No. 64.)  The defendants argue that this case is analogous to *Petro Stopping Centers, L.P.*, where the Court found that the plaintiff's "meager evidence" of

actual confusion actually undermined the plaintiff's claim.  *See* 130 F.3d at 95; *see also George & Co. LLC*, 575 F.3d at 399 (characterizing "four instances of consumer confusion" as "at best *de minimis*").  The argument is unpersuasive.

First, the Court does not understand *Petro Stopping Centers* and *George & Co.* to stand for the proposition that evidence of only a few instances of actual confusion is irrelevant or harmful to a plaintiff's case.  What the Court of Appeals emphasized in those cases was the limited evidence of actual confusion *in light of* the significant scale of the plaintiffs' businesses.  *See Petro Stopping Centers, L.P.*, 130 F.3d at 95 (describing the plaintiff as "a significant commercial actor in the truck stop industry" with a "huge volume of commerce"); *George & Co. LLC*, 575 F.3d at 399 (indicating that the plaintiff sold "500,000 LCR games per year").  As Professor McCarthy explains, "[e]vidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence."  4 McCarthy on Trademarks and Unfair Competition § 23:14 (4th ed.).  Moreover, "given the proper factual setting, even just a few instances of actual confusion can provide very persuasive evidence of how and why confusion can occur."  *Id.*

Second, the Court questions how being mistakenly sued by a "customer" who is not really your customer can possibly be characterized as a "weak instance" of consumer confusion?  Parties like Choice Hotels undoubtedly have an interest in not being sued for conditions they have no control over.  And what is almost certainly more troubling to Choice Hotels than the inconvenience of this specific lawsuit is the larger prospect of angry customers who think that Choice Hotels is responsible for the Subject

Property.  For every confused, disgruntled patron who actually goes through with a lawsuit, there may be countless others who walk out dissatisfied and warn their friends and family to avoid the chain.  Indeed, in evaluating the weight of this evidence, the Court is mindful of how unlikely it is that the plaintiff in this case will actually discover any particular instance of consumer confusion.

Unlike, for example, the *Kaushik* case where the plaintiff had a franchisee operating an Econo Lodge across the street from the alleged infringer, there is no evidence in the record that Choice Hotels had any representatives or affiliates around the Subject Property on a regular basis.  This substantially diminishes the opportunities for the plaintiff to observe and document instances of actual confusion because there is a not another franchisee who is reporting instances where calls or deliveries are made to the wrong hotel or where customers end up in the wrong location.  The evidence of actual confusion in this case arises from instances where patrons were sufficiently upset about their experience at a single hotel that they went beyond contacting on-site management and complained to  the plaintiff, which they believed to be the franchisor.  Thus while the total number of instances may be small, the Court finds them to be considerable evidence of actual consumer confusion.[7]

### (8) *The Quality Of The Defendants' Product*

This factor "applies in 'situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods.'"  *George & Co. LLC*, 575 F.3d

---

[7] The presence of evidence of consumer confusion in this case is one of the most significant factors that distinguish this case from *Kaushik*, where the court completely discounted the limited evidence of actual consumer confusion because the plaintiff's witnesses were not credible.  *See* 147 F.Supp. 2d at 1254.

at 399 (quoting *Sara Lee*, 81 F.3d at 467).  The parties do not address this factor, and the Court finds that it is not relevant in this case.

### (9) *The Sophistication Of The Consuming Public*

"Barring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public at-large."  *Sara Lee Corp.*, 81 F.3d at 467.  Here there is no reason to believe that the relevant market is anything other than the public at large, and, accordingly, the Court finds this factor to be irrelevant.

In summary, the Court finds that the plaintiff's marks are distinct, that the similarity factors favor the plaintiff, that there is insufficient evidence to conclude from the record alone that the defendants intended to infringe the plaintiff's trademarks with their new name, and that plaintiff has demonstrated actual confusion.  Considering these factors together, the Court finds that the defendants' use of ECONO STUDIOS INN AND SUITES creates a likelihood of consumer confusion and infringes the plaintiff's mark, ECONO LODGE INN AND SUITES.

## II.     Other Claims (Federal Unfair Competition and Common Law Trademark Infringement)

In addition to its claim for trademark infringement, the plaintiff has also advanced claims for unfair competition under Section 43(a) of the Lanham Act and common law trademark infringement against the defendant Zeal, LLC.  It appears that the standards to prevail on these claims are the same as those applicable for trademark infringement. *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (listing the same elements for trademark infringement and unfair competition); *BMW of N.A., LLC v. FPI MB Ent., LLC*, CA 4:10-82-TLW-SVH, 2010 WL 4365838, at *1 (D.S.C. Sept. 13, 2010) *report and recommendation adopted,* CIV.A. 4:10-82-TLW-S, 2010 WL

4340929 (D.S.C. Oct. 28, 2010) ("The standards for federal and South Carolina common law trademark infringement and unfair competition are the same.").  The defendants have not specifically contested the unfair competition and common law trademark infringement claims, and pursuant to the findings above, the Court determines that the plaintiff is entitled to summary judgment on these claims as well.

### III.    Requested Relief

Having found that the defendants infringed the plaintiff's trademarks, the Court turns to the question of appropriate relief.  The plaintiff has sought both injunctive and monetary relief, and the Court finds that the plaintiff is entitled to both.

### A. Injunctive Relief

15 U.S.C. § 1116 governs injunctive relief under the Lanham Act, and provides that courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *Id.* A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The defendants do not challenge the plaintiff's request for injunctive relief, aside from their general arguments that there is no infringement.  The Court finds that the plaintiff has satisfied the four-part test as set forth below and is entitled to injunctive relief.

26

### 1. *Irreparable Injury*

"[I]n Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002).  This presumption arises because of the nature of the injury in a typical case of trademark infringement.  As the Fourth Circuit explained, "[i]nfringement gives rise to irreparable injury, in that plaintiff has lost control of its business reputation to this extent, there is substantial likelihood of confusion of the purchasing public, there may be no monetary recovery available, and there is an inherent injury to the good will and reputation of the plaintiff." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) (quotation marks and citation omitted).  This concern is certainly applicable in this case.  "While under *eBay* a finding of irreparable harm on its own does not automatically trigger injunctive relief," courts have "continued to find that irreparable harm is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element of an infringement case." *Reynolds Consumer Products, Inc. v. Handi-Foil Corp.*, 1:13-CV-214, 2014 WL 3615853, at *12 (E.D. Va. July 18, 2014) (citing examples), *appeal dismissed* (Dec. 19, 2014).  The plaintiff has established likelihood of confusion and actual confusion, and the defendant has done nothing to rebut the presumption of irreparable injury.  Accordingly, the Court finds that the plaintiff has suffered an irreparable injury.

### 2. *Lack of an Adequate Remedy at Law*

A defendant's response to litigation is relevant in assessing whether a plaintiff has an adequate remedy at law.  *See Mary Kay Inc. v. Ayres*, 827 F. Supp. 2d 584, 596

(D.S.C. 2011) (finding that the defendant's "action—and inaction" in the face of the litigation "demonstrate[d] her refusal to acknowledge [her] legal obligations, ma[de] the threat of continued infringement likely, and underscore[d] the ineffectiveness of a remedy at law."). While the defendants have participated in this case, it appears to the Court that they have, without explanation or justification, refused to respond to the plaintiff's discovery requests regarding the calculation of potential damages. Additionally, in an effort to take advantage of a prime business opportunity (a bike week event), the defendants were willing to operate the Subject Property before it had been deflagged, despite the fact that they knew they had no right to do so. The risk of a lawsuit and monetary damages were clearly insufficient to deter the defendants from infringing the plaintiff's marks. In light of these facts, the Court shares the plaintiff's concern that it lacks an adequate remedy at law.

### 3.  *Balance of Hardships*

The balance of hardships clearly tips in favor of Choice Hotels. On the one hand, there can be no doubt that Choice Hotels has a significant interest in maintaining the integrity of its intellectual property, including its ECONO LODGE family of marks and the good will associated therewith. Choice Hotels and/or its predecessor in interest has been using the mark in commerce in connection with hotel services for more than forty (40) years and has numerous incontestable trademark registrations. On the other hand, preventing the defendants from using a mark they never had the right to use in the first place can hardly be characterized as a hardship. Furthermore, the defendants have represented to the Court that they have already taken steps to remove the infringing

mark from the Subject Property.  Thus, the Court finds that the balance of hardships favors Choice Hotels.

### 4.  Public Interest

The Court agrees with Choice Hotels that the requested injunction would serve the public interest.  It is well established that "the public interest is served by preventing consumer confusion in the marketplace."  *Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001); *see also Scotts Co.*, 315 F.3d at 286 (observing that "there is a strong public interest in the prevention of misleading advertisements" (quotation marks and citation omitted)).  The defendant has not offered any argument or evidence that the requested injunction would be adverse to the public interest.

Having found that the plaintiff has satisfied the four requirements for injunctive relief, the Court grants the plaintiff's request for a permanent injunction.  The defendant Zeal is hereby (1) enjoined from using any of the plaintiff's ECONO LODGE marks, including the marks appearing in the '642 Registration; the '814 Registration; the '518 Registration; the '530 Registration; the '688 Registration; the '065 Registration; the '067 Registration; and the '199 Registration; or any mark confusingly similar thereto, including the ECONO STUDIOS INN & SUITES designation; (2) ordered to remove all signage, advertisements, menus, websites or any other indicia bearing any of the above referenced marks or the ECONO STUDIOS INN & SUITES designation; (3) ordered to destroy any item in its custody or control bearing any of the above referenced marks and/or the ECONO STUDIOS INN & SUITES designation; and (4) ordered to file a sworn statement of compliance within thirty (30) days of this Order.

### B. **Monetary Damages**

Under the Lanham Act, a plaintiff who establishes trademark infringement is entitled "to recover, (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). Section 1117(a) provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." "The infringer's burden of proving deductible costs is not carried by records showing only a vague, undifferentiated category of 'overhead' or 'checks written.'" 5 McCarthy on Trademarks and Unfair Competition § 30:66 (4th ed.). "If the infringer provides no evidence from which the court can determine the amount of any cost deductions, there is no obligation to make an estimate, and 'costs' need not form any part of the calculation of profits." 5 McCarthy on Trademarks and Unfair Competition § 30:66 (4th ed.). In other words, the court may award proceeds as if they were profits. *See, e.g.*, *Entrepreneur Media, Inc. v. JMD Ent. Group, LLC*, 958 F. Supp. 2d 588, 597 (D. Md. 2013) (Observing that "when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence as to the costs of goods sold, then the profits to which the plaintiff is entitled under the Lanham Act are equal to the infringer's gross sales." (quotation marks and citation omitted).); *New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301 (N.D.N.Y. 1996) (same); *see also* 5 McCarthy on Trademarks and Unfair Competition § 30:66 (4th ed.) ("When the burden is not carried, plaintiff is awarded all revenue for that year.").

While this may seem a harsh result, it sensibly "places the burden of proving costs on the party with the superior access to such information, namely the infringing

defendant." *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990).   As the Supreme Court explained, "[t]here may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark.   But to hold otherwise would give the windfall to the wrongdoer." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942).

Still, a Court has considerable discretion in determining profits.  *See Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) (noting that "[s]ome courts have allowed the plaintiff to recover profits even though the defendant lost money on the theory that the plaintiff should not be prejudiced by the defendant's inefficiency," and affirming such an award as a proper "exercise of the court's discretion," which "further[ed] the statute's goals"); *A & M Records, Inc. v. Abdallah*, 948 F. Supp. 1449, 1459 (C.D. Cal. 1996), *as amended* (Nov. 21, 1996) (estimating 50% expenses where a the defendant offered no proof of operating costs and expenses).

In this case, the defendants appear to have completely disregarded the plaintiff's discovery requests regarding its revenue and expenses.  The defendants filed a motion to compel on February 14, 2014.  (*See* ECF No. 25.)  Following a telephone conference with Judge Harwell on February 18, 2014, the parties entered into a consent order (ECF No. 28), pursuant to which the defendant, Zeal, LLC, was to provide complete responses to the plaintiff's discovery requests.

In their motion for summary judgment, the plaintiff alleges that "Zeal's discovery responses were facially deficient" and that "Zeal represented that it didn't have any documents related to gross room revenues, costs, or dollar sales associated with the

operation of the hotel at the Subject Property."  (ECF No. 58-1 at 24.)  In support of its argument, the defendants attached Zeal's discovery responses (ECF No. 58-6), which indicate that, at the time, Zeal had nothing to produce in response to the requests referenced above but "reserved a right" to supplement the response in the future.  The plaintiff also claims that they sought additional information regarding the defendants' refusal to produce the requested documents and information in the October 30, 2014 deposition of Zeal's 30(b)(6) witness, which was ultimately held over so that Zeal could supplement its discovery responses.  (*See* ECF No. 58-2 at 138.)

The plaintiff maintains that the defendants never supplemented their discovery responses.  On December 11, 2014, the plaintiff's counsel sent an email to the defendants' counsel indicating that discovery responses still had not been received and stating he would "assume that there will be no supplemental responses to any discovery requests <u>or</u> any additional information/documentation provided."  The defendants' counsel responded, "Assume anything you like.  It is your witness who says there is no evidence."[8]  (ECF No. 58-8.)  The plaintiff submits that the only evidence it has regarding Zeal, LLC's proceeds, profits, expenses, etc. with regard to the Subject

---

[8] This retort seems to be a reference to statements made in the deposition of Mike Hobson, a Choice Hotels brand consultant whose only involvement in this case appears to be the fact that he took pictures of the defendants' old sign and new sign (the photo that appears in the complaint).  During the deposition, Hobson acknowledged that there were differences between the colors, font, and wording on the defendants' new sign and the colors, font, and wording on the signs used by Choice Hotels.  (*See* ECF No. 66 at 23:13 – 24:10.)  The defendants have pounced on this evidence as if it is an admission that there is no risk of confusion.  Whether a *branding expert* for Choice Hotels is able to recognize differences between his employer's trademark and the defendants' sign is by no means dispositive on the issue of likelihood of confusion.  As the Court explained in great detail above, likelihood of confusion is assessed using a multi-factored test, and it is not clear to this Court that Hobson's testimony has any relevance to any of those factors.  Hobson simply acknowledged graphic differences in the parties' signs that the Court has accounted for by looking at the actual signs.  His deposition testimony does not create a material issue of fact or significantly impact the Court's analysis in any way.

Property is the testimony of Zeal, LLC's 30(b)(6) deponent that as of October 30, 2014, the gross revenue for the Subject Property was $876,484.00.  (ECF No. 58-2 at 110:20-21.)  Drawing a monthly average from this figure, the plaintiff estimates that the gross revenues from the Subject Property are $87,648.40.  Applying this monthly figure to the 27 months during which the defendants are alleged to have infringed the mark, the Court calculates gross proceeds in the amount of $2,366,506.80.

The defendants' response in opposition to the plaintiff's motion for summary judgment did not address the issue of damages.  The terms "damages," "expenses," "proceeds," "profits," and "gross revenues" appear nowhere in the defendants' memorandum, which focuses exclusively on the issue of liability.  When the Court asked the defendants' counsel why the documents and figures that the plaintiff had requested had not been produced, the response was essentially that the defendants had turned over everything they had.  In short, the defendants had no argument and no evidence on the issue of damages.  Concerned about the implications of the situation, the Court gave the defendants two weeks to submit additional information and argument on the issue of damages.  This gave the defendants a deadline of September 1, 2015, two weeks from the date of the hearing.  The Court also granted the plaintiff leave to file a response.

On August 28, 2015, counsel for the defendants submitted a letter with six attachments (ECF No. 85), which included: (1) Zeal, LLC's 2013 Federal Partnership Income Tax return (dated September 14, 2014); (2) Zeal, LLC's 2014 Federal Partnership Income Tax return (dated August 22, 2015); (3) 2012 financial statements for "North Myrtle Beach Hotels, Inc. d/b/a Econo Hotel;" (4) a brochure for the Myrtle

Beach Econo Lodge; (5) a statement of income & expenses for January 1 – December 31, 2009 and 2010 for "North Myrtle Beach Hotels, Inc. d/b/a Microtel Hotel;" and (6) a May 28, 2013 cease and desist letter from the plaintiff to the defendants.  The defendants did not submit a brief or affidavit identifying the significance of these documents, proposing a revised damage calculation, or authenticating any of the documents.

On September 2, 2015, a day after the deadline for additional submissions, the defendants filed the affidavit of the defendant Harshil J. Shah (ECF No. 86-1), who is identified as an officer of Zeal, LLC.  The affidavit admits that Zeal operated for "a couple of weeks" using the plaintiff's sign, claims the business did poorly with the plaintiff's name and had done poorly in the past, and alleges that the plaintiff honored the defendants' use of its sign during a short period of negotiation and that thereafter the defendants changed their signage "to disconnect use [sic] from the previous reputation."  The affidavit further indicates that the defendants are filing Zeal, LLC's bank statements (ECF Nos. 87-88), which allegedly show that while the hotel has "done better under our sign than the hotel did under the Choice Hotel sign," it has "not been profitable."  Finally the affidavit attests that the information provided to the Court on August 28, 2015 is "true and accurate."

The defendants' submission is not acceptable, and the Court entered a text order instructing the plaintiff that it need not file any response (ECF No. 89).  As noted, once a plaintiff establishes the defendants' proceeds, which the plaintiff in this case has done to the best of its ability, the burden shifts to defendants to "prove all elements of cost or deduction claimed."  The Court does not know what amount of costs or deductions the

defendants are claiming because they failed to submit any briefing or arguments about the proper measure of damages in the event damages are awarded.  Filing a series of documents without explanation, authentication, or proposed calculations does not in any way satisfy the defendants' burden.  The only document that provided anything approaching an explanation was a woefully inadequate affidavit that was filed after the deadline imposed by the Court.

Even if these documents were not filed late, the Court would still be hesitant to consider them because they clearly should have been produced to the plaintiff in discovery.  When defense counsel indicated to the Court that the defendants had produced everything they had, the Court assumed that the defendants' records had been lost, destroyed, or were otherwise unavailable and that Zeal, LLC was going to have to try to recreate its expenses through, for example, invoices, receipts, checks, or some other source of information that was not readily available.  The Court was shocked to receive tax returns from a CPA and bank records from one of the largest financial institutions in the United States (BB&T).  It is inconceivable to the Court that copies of these documents could not have been obtained during the discovery period.[9] Absolutely no explanation was provided, either in the response to the motion for summary judgment or the recent submissions, for the defendants' repeated refusal to produce the information requested.

---

[9] The Court notes that Zeal, LLC's 2014 tax return does not appear to have been available until August 22, 2015, but the defendants could have easily provided other records of their deductible costs for 2015, especially since they knew that the ligation had been filed and such information had been requested prior to 2015.  At a minimum, they could have advised the plaintiff that their 2014 tax information would not be available until now.  There is nothing to suggest that the other documents, including the 2013 tax return, were unavailable.

For the Court to consider these documents now, after discovery has closed and dispositive motions have been briefed and argued, would be unfair and prejudicial to the plaintiff.  Short of reopening discovery, there would be no way for the plaintiff to test the accuracy or veracity of the plaintiff's accounting.   To incorporate the defendants' submission in the form it was received would require the Court to not only comb through the records submitted, but to presume them to be accurate.  While the Court has no desire to impose a harsh result on the defendants, their submission is insufficient to be considered at this stage.  Unless the defendants can provide a compelling explanation for why these documents were not produced in discovery, the Court will be forced to accept the plaintiff's calculation of the defendants' profits, which is $2,366,506.80.

The plaintiff also argues that it is entitled to recover damages that it sustained as a result of the infringement, which are calculated based on what the defendants would have had to pay as a franchisee.  *See Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.,* 606 F. Supp. 2d 571, 584 (M.D.N.C. 2009) ("Courts have recognized that where damages are difficult to measure, an appropriate measure of damages includes an approximation of the royalties the defendant would have had to pay, had it recognized the validity of the plaintiff's claims." (quotation marks, citation, and alteration omitted)).  The plaintiff asserts that these royalties would total $148,225.53, and the defendants have not contested this calculation.   The plaintiff seeks costs in the undisputed amount of $1,736.69.  Alleging that the defendants' infringement was willful, the plaintiff requests that the Court treble the damages resulting from infringement and award the plaintiff attorney's fees.

While 15 U.S.C.A. § 1117(a) allows the Court to treat the defendants' proceeds as profits where the defendants fail to carry their burden to establish costs or deductions, it also affords the Court discretion to adjust a recovery of profits as equity requires.  The section provides in relevant part, "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just according to the circumstances of the case."  The Court finds that the plaintiff is unquestionably entitled to damages, but would like to hear from the parties on two issues before it finalizes the amount of damages to be awarded: 1. Should the Court exercise its discretion to reduce the recovery based on the infringer's profits, which currently stand at $2,366,506.80?  2. Should the plaintiff's infringement be considered willful and should the Court treble the $148,225.53 in damages for infringement and award the plaintiff attorney's fees?  Within 21 days of the date of this Order, the parties may submit briefing on these topics, not to exceed 10 pages.  The Court will likely schedule a hearing after considering the parties' submissions.

The plaintiff has established that it is entitled to summary judgment on its claims, and to the damages that follow therefrom.  The Court does not wish to draw out this action unnecessarily or to delay the relief to which the plaintiff is entitled.   The defendants' handling of this litigation is, quite frankly, baffling, and the plaintiff has every right to be exasperated.  Still, the Court is hesitant to award damages that could total around **three million dollars** without giving the defendants a final opportunity to explain themselves and to convince the Court to exercise its discretion and reduce   the

damages authorized by law.[10]   Any doubts the defendants may have had about the seriousness of this litigation should now be laid to rest, and the defendants should understand clearly the magnitude of the liability they face.

## CONCLUSION

The plaintiff's motion for summary judgment (ECF No. 58) is **GRANTED**.  The defendant Zeal, LLC is hereby (1) enjoined from using any of the plaintiff's ECONO LODGE marks, including the marks appearing in the '642 Registration; the '814 Registration; the '518 Registration; the '530 Registration; the '688 Registration; the '065 Registration; the '067 Registration; and the '199 Registration; or any mark confusingly similar thereto, including the ECONO STUDIOS INN & SUITES designation; (2) ordered to remove all signage, advertisements, menus, websites or any other indicia bearing any of the above referenced marks or the ECONO STUDIOS INN & SUITES designation; (3) ordered to destroy any item in its custody or control bearing any of the above referenced marks and/or the ECONO STUDIOS INN & SUITES designation; and (4) ordered to file a sworn statement of compliance within 30 days of this Order.  Within 21 days, the parties may submit briefing not to exceed 10 pages regarding whether the Court should exercise its discretion to reduce the recovery of profits and whether the plaintiff is entitled to treble damages and attorney's fees.  The motion to stay (ECF No. 77) is **MOOT**.

**IT IS SO ORDERED.**

---

[10]  To be clear, this is not an opportunity for the defendants to challenge the Court's determinations on the merits or to ask the Court to recalculate the defendants' profits.  Absent an extraordinary explanation for why the documents submitted to the Court on August 28 and September 2 were not turned over to the plaintiff when such information was requested in discovery, the Court is not inclined to consider them.

s/ Bruce Howe Hendricks
United States District Judge

September 29, 2015
Greenville, South Carolina